J-A04012-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 803 MDA 2025 |

Appeal from the Decree Entered May 23, 2025
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s):  62 OC 2024

| | | |
|---|---|---|
| IN THE INTEREST OF S.D.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 804 MDA 2025 |

Appeal from the Decree Entered May 23, 2025
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s):  63 O.C. 2024

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.J. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 805 MDA 2025 |

Appeal from the Decree Entered May 27, 2025
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s):  64 O.C. 2024

BEFORE:   PANELLA, P.J.E., KING, J., and LANE, J.

MEMORANDUM BY PANELLA, P.J.E.:                    **FILED: MAY 12, 2026**

E.S. ("Mother") appeals from the decrees in the Tioga County Court of Common Pleas that involuntarily terminated her parental rights to her sons, A.M.J., born in March 2013, S.D.J., born in July 2014, and D.L.J., born in October 2018 (collectively, "the Children").[1]  Upon review, we affirm.

We gather the following factual and procedural history of this case from the certified record.  On February 10, 2023, Tioga County Department of Human Services ("DHS") obtained emergency protective custody of the Children, ages nine, eight, and four, respectively, who were then residing with Mother, her paramour, D.W.,[2] and D.W.'s teenage daughter from another relationship, A.W.  *See* N.T., 1/15/25, at 38.  DHS removed the Children from Mother's care following the receipt of two audio recordings taken by A.W. that contained purported abuse perpetrated by Mother's paramour against the Children.  *See id.*  The recordings of alleged abuse were the basis of a February 17, 2023, Child Protective Services ("CPS") report which alleged that both Mother and D.W. committed child abuse against the Children.  *See id.*;

_____

[1] On May 26, 2025, by separate decrees, the orphans' court terminated the parental rights of the Children's biological father, D.W. ("Father").  Father filed notices of appeal which we address in a separate memorandum at Superior Court Docket Nos. 838-840 MDA 2025.

[2] We recognize that Father and Mother's paramours have the same initials.  In this memorandum, we refer to Mother's paramour as D.W.

*see also* DHS Exhibit 17. Following an investigation, DHS deemed the report indicated with respect to A.M.J. and S.D.J., but not D.L.J., the youngest child.[3] *See* N.T., 1/15/25, at 38-39; *see also* DHS Exhibit 17.

According to A.W., she recorded the above-described alleged physical abuse of the Children due to her concern that they would "end up in the hospital or in an early grave." N.T., 1/15/25, at 119. A.W. testified that D.W. and Mother began utilizing a paddle to strike the Children in approximately November 2022. *See id.* at 108, 117. A.W. reported that when D.W. introduced the paddle,

> He sat down on the couch and called all of us into the living room
> . . . and he set [the paddle] on the armrest closest to us. He said,
> this is what you little shits are going to get every time from now
> on the next time you misbehave and it's got holes in it to provide
> more pain, it hurts more on purpose.

*Id.* at 110. A.W. stated that the punishments occurred for "basically anything[,]" including being "too loud" or not "cleaning your room." *Id.* at 117. In addition, A.W. testified that Mother was "typically in the same room" for punishments inflicted by D.W. upon the Children. *Id.* at 112.

The Children have been in numerous, separate foster placements since their removal. *See* N.T., 1/17/25, at 112-117. A.M.J., the oldest child, suffers from autism and was defiant and argumentative in his foster placements. *See*

---

[3] DHS caseworker, Carrie Milkie, testified that a general protective service ("GPS") report was validated for inappropriate discipline perpetrated against the Children as to Mother. *See* N.T., 1/31/25, at 26; *see also* DHS Exhibit 17.

N.T., 1/31/25, at 111; *see also* N.T., 1/17/25, at 112-113. S.D.J., the middle child, is diagnosed with oppositional defiant disorder ("ODD") and attention deficit hyperactivity disorder ("ADHD") and also had behavioral issues in his foster placements. *See* N.T., 1/31/25, at 112; *see also* N.T., 1/17/25, at 114-115. It is important to note that S.D.J. was hospitalized because of his mental health at the time of the subject proceedings, discussed *infra*. Likewise, D.L.J. is diagnosed with ODD and exhibited behavioral issues in his foster placements. *See* N.T., 1/30/25, at 34; *see also* 1/29/25, at 198-199.

The juvenile court adjudicated the Children dependent on April 11, 2023, and established their permanency goals as reunification. In furtherance thereof, the court ordered Mother to, *inter alia*: (1) complete a psychological evaluation and follow any recommendations; (2) participate in individual therapy; (3) attend supervised visitation with the Children; (4) complete a batterer's intervention program; and (5) and cooperate with reunification services.

Mother largely complied with her mandated services, but she failed to make any meaningful progress towards reunification. Following their removal, Mother consistently attended supervised visits with the Children, which occurred for two hours twice per week. *See* DHS Exhibit 4. Initially, Mother visited with the Children collectively. *See id.* However, according to the family's former reunification service provider, Clara Holley, Mother could not effectively parent and discipline the Children collectively. *See* N.T., 1/17/25,

- 4 -

at 144. She described the visits as "chaotic." **Id.** Ms. Holley stated that the Children's behaviors were "horrible" during the visits, and that they were "physical[ly] abusive" to both her and Mother. **Id.** Accordingly, towards the end of 2023, Mother began individually visiting the Children once per week for an hour each. **See** N.T., 1/29/25, at 30-31; **see also** DHS Exhibit 40.

Mother also completed a psychological evaluation, individual counseling, and a batterer's intervention course. **See** N.T., 1/15/25, at 79; **see also** N.T., 1/31/25, at 21-22. Despite the completion of these services, Mother continued to deny that the Children were abused by her and D.W. **See** N.T., 1/31/25, at 26. Further, when she did acknowledge that the Children were abused, she only admitted to a singular occasion. **See** N.T., 1/15/25, at 38-41.

On July 30, 2024, DHS filed petitions seeking the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In compliance with Section 2313(a) of the Adoption Act, the court appointed Jamie L. Cook, Esquire, as legal interest counsel ("LIC") for the Children. **See** Order, 7/31/24. Further, the court appointed Timothy A.B. Reitz, Esquire, as the Children's guardian *ad litem* ("GAL"). **See id.**

The orphans' court conducted an evidentiary hearing over the course of seven days: January 15, 2025, January 17, 2025, January 29-31, 2025, and March 27-28, 2025, at which time the Children were approximately eleven,

ten, and six years old, respectively. DHS and the GAL offered the testimony of numerous witnesses. Relevant to Mother's appeal, DHS presented the testimony of Ms. Holley; Ms. Milkie; A.W.; Caroline Phillips, supervisor of the Children's treatment and therapist of D.L.J. at Crossroads Counseling;[4] and Meghan Harer, reunification services provider. DHS also introduced, and the court admitted, a myriad of exhibits. Mother testified on her own behalf and presented the testimony of Susan Haas-Wirth, the current family support provider.

The orphans' court issued decrees on May 23, 2025, involuntarily terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Simultaneously, the court filed an opinion explaining its rationale. On June 19, 2025, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.[5] On July 31, 2025, the orphans' court filed its Rule 1925(a) opinion.

_____

[4] The court accepted Ms. Phillips as an expert in trauma and attachment therapy. **See** N.T., 1/30/25, at 11-13.

[5] We note that despite being represented by legal counsel, Mother filed *pro se* notices of appeal. **See** Pa.R.A.P. 121(g) ("Where there is counsel of record, a party may file only the following documents *pro se*: (i) a notice of appeal . . . ."). On August 19, 2025, Mother's attorney during the termination proceeding, Bryan C. Fitzcharles, Esq., filed a petition to withdraw in conjunction with an **Anders** brief. **See Anders v. California**, 386 U.S. 738 (1967). On August 19, 2025, Mother filed a motion requesting that the court grant Attorney Fitzcharles' request to withdraw so she could represent herself. *(Footnote Continued Next Page)*

On appeal, Mother presents the following issues for our review:

1. Was the orphans' court's decision to involuntarily terminate Mother's parental rights supported by competent evidence?

2. Did the orphans' court commit an abuse of discretion in involuntarily terminating Mother's parental rights?

3. Did the orphans' court commit an abuse of discretion in finding that the best interests of the Children will be served by terminating Mother's parental rights?

Mother's Brief at 8 (cleaned up).[6]/[7]

Our standard of review in this context is well-established:

_____

In response, this Court filed an order directing the orphans' court to rule on Mother's motion. **See** Order, 9/17/25. On October 3, 2025, the orphans' court permitted the withdrawal of Attorney Fitzcharles and appointed Anne K. Leete, Esquire, to represent Mother. Thereafter, Attorney Leete filed an advocate's brief on Mother's behalf.

[6] While Mother presents three issues in her statement of questions involved, she provides just two headings in her argument section. **See** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."). Despite this organizational defect, we proceed with the merits of Mother's appeal as we are able discern the issues raised on appeal which were addressed by the orphans' court in its Rule 1925(a) opinion. **See** Pa.R.A.P. 2101 (stating, "Briefs . . . shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed. . . .").

[7] We note with displeasure that the GAL and the LIC failed to file briefs in the instant appeal. However, at the conclusion of the hearing on March 28, 2025, the LIC reported that the Children preferred to be reunified with Mother. **See** N.T., 3/28/25, at 56-59. Further, in compliance with the orphans' court's directive, the LIC filed proposed findings of fact and conclusions of law. Therein, she requested that the orphans' court deny DHS's petitions. **See** LIC Proposed Findings of Fact and Conclusions of Law, 4/25/25.

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing

evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See M.E.*, 283 A.3d at 830 (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Our analysis in this case will focus upon 23 Pa.C.S.A. § 2511(a)(2) and (b),[8] which provide, as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

---

[8] Given our disposition with respect to Section 2511(a)(2), we need not review the orphans' court's findings regarding Section 2511(a)(1), (5), or (8). *See In re K.R.*, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (observing that this Court may proceed to a review of one subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)).

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has directed that a Section 2511(b) inquiry must include consideration of the bond between the parent and the child. *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993); *see also Interest of K.T.*, 296 A.3d 1085, 1109-10 (Pa. 2023).

- 10 -

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." **T.S.M.**, 71 A.3d at 269. Indeed, the High Court stated:

> Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children.

**Id.** "The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained. **K.T.**, 296 A.3d at 1109. A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional consequences" or significant, irreparable harm. **Id.** at 1109-10.

This Court has recognized that,

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

- 11 -

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Our Supreme Court has recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109.

With respect to Section 2511(a)(2), Mother argues that the orphans' court abused its discretion because she provided appropriate "care and nurturing" during her supervised visitation with the Children and did not perpetrate abuse upon them. Mother's Brief at 16-17. Moreover, Mother argues that her ability to appropriately care for and safeguard the Children was "never adequately tested or measured" due to this limited, supervised contact. *Id.* at 17. Finally, Mother argues that the orphans' court abused its discretion because she participated in the requisite services under the permanency plan. *See id.* at 18-20. Mother emphasizes that she demonstrated the ability to remedy her alleged abusive behavior and protect the Children and now comprehends the seriousness of the abuse they endured. *See id.* Overall, Mother argues that she was diligently working to remedy DHS's concerns and that she was capable of appropriately disciplining

and protecting the Children and notes that her individual visits with the Children were "improved."[9]  ***Id.***

In its Rule 1925(a) opinion, the orphans' court provided the following analysis related to Section 2511(a)(2):

> Mother has consistently denied or minimized the issues giving rise to the instant removal to DHS (N.T., 1/17/25, at 135-136; N.T., 1/31/25, at 9), to service providers for both her and the Children (N.T., 1/31/25, at 34), the trial court (N.T., 1/31/25, at 123; N.T., 3/27/25, at 45-46), and even to the Children themselves (***see, e.g.*** N.T., 1/17/25, at 123; N.T., 1/29/25, at, 203-204; N.T., 1/31/25, at 26).  When confronted on this subject, she offers a panoply of justifications.  However, the fact of the matter is: she continued to argue about and misconstrue the results of investigations, including at a medication management meeting on August 28, 2024, where she told D.L.J.'s doctor that she did not know why the Children were removed as all the abuse came back unfounded.  ***See*** DHS Exhibit 34.  She continued arguing, even under oath at the hearing on January 15, 2025, that there was only one single act of physical abuse and it was perpetrated exclusively by [D.W.]  ***See*** N.T., 1/15/25, at 38-41.  She focuses on the February 17, 2023 [CPS] determination that was unfounded as to D.L.J. as conclusive proof that D.L.J. was never abused, but overlooks the [GPS] report . . ., which was validated as to each of the Children for inappropriate discipline.  ***See*** DHS Exhibit 17; N.T., 1/31/25, at 34; *cf.* N.T., 1/15/25, at 38.  It simply beggars belief that Mother is still confused as to the report regarding this matter, after repeated clarifications and approximately 23 months after their issuance.
>
> Subsequent to removal, Mother would begin to develop skills relating to appropriate discipline and protective capacity, begin to implement them, and then abandon them within weeks.  ***See,***

---

[9] Mother also baldly "question[s]" whether her progress was impeded by Ms. Holley, reunification service provider, because they did not work well together.  ***See*** Mother's Brief at 19-20.  There is no indication in the certified record that Ms. Holley prevented Mother from completing her services.  Indeed, once Ms. Holley determined she could not effectively provide services to Mother, she withdrew from the case.  ***See*** N.T., 1/29/25, at 24.

*e.g.*, N.T., 1/29/25, at 27.  This would only serve to confuse the Children more, as they were not able to have set expectations between one visit to the next.  Meghan Harer testified that Mother could not regulate her own emotions enough to be consistent in her parenting during visits.  Ms. Harer documented the lack of progress as well as ongoing denial of abuse in a report covering a service period from the start of October to mid-November 2024, some 18 to 20 months after removal of the Children, and several months after the petitions were filed.  [Ms. Harer's] report included "[Mother and D.W.] have stated repeatedly that they are good parents and that they should not have had their kids taken from them."  DHS Exhibit 38; N.T., 1/30/25, at 176-177.  Related to protective capacity, the same report relates that "[D.W.] states that he cannot guarantee he will never abuse the [C]hildren again should they return to his care and that it is an **<u>unrealistic and an unreasonable expectation to ask of him and [Mother]</u>**."  DHS Exhibit 38 (emphasis added).  [D.W.] suggested that this proposition was like asking him to drive everyday but never get into an accident, and Mother "adamantly agreed[.]" *Id.*  Following this surreal argument, the section [of the report] concludes with the following, "Harer asked [Mother] what she would do if the [Children] were returned and [D.W.] became abusive again.  [Mother] said that she didn't know." *Id.*

The inexorable conclusion from a review of the record was that Mother still lacked protective capacity.  Moreover, it supports the conclusion that she endorsed and engaged in the abuse and still refuses to acknowledge her role and responsibility.  While she now says she recognizes abuse and would not allow it to happen again, Mother asserted that it would be "unrealistic" and "unreasonable" for [D.W.] to guarantee he would not abuse the Children in the future.

Orphans' Court Opinion, 7/31/25, at 15-17 (cleaned up).  The certified record supports the court's findings.

The record amply demonstrates that Mother was incapable of protecting the Children and refused to accept responsibility for, or even consistently acknowledge, the abuse the Children suffered.  Ms. Milkie, DHS caseworker, testified that Mother described the abuse as a singular incident.  *See* N.T.,

- 14 -

1/31/25, at 9. She further stated that Mother "kind of [went] back and forth. She's [talked to providers] about the abuse that [occurred] in the home, but then I would talk to her [shortly] after that, [and] she would say that [abuse] didn't happen or she didn't remember." *Id.*

Further, Mother denied the abuse directly to the Children. J.M., D.L.J.'s foster father at the time of the termination hearing, testified that when D.L.J. was hospitalized in December 2024, Mother visited him. *See* N.T., 1/29/25, at 203. J.M. testified that D.L.J. said to Mother that he remembered "why I was taken away from you. . . . [B]ecause you hit me and my brothers." *Id.* at 203-204. J.M. stated that Mother denied D.L.J.'s claim and "abruptly changed the conversation . . . ." *Id.* at 204. Ms. Milkie also confirmed that Mother denied any abuse in front of the Children, as follows:

> Mother has made it very clear to [the Children] that they shouldn't talk about the trauma. That it didn't really happen. There [were] incidents of that happening when she was in . . . the intake for [S.D.J.'s psychological evaluation,] and S.D.J. tried to disclose [the abuse to the provider]. [A]t a dentist appointment in 2023, . . . she was holding [D.L.J.] in her lap with a case aide, and she . . . told the case aide right in front of [D.L.J.] that none of that abuse had happened.

N.T., 1/31/25, at 26.

When Mother did acknowledge that abuse occurred, she claimed to be aware of just one incident. *See* N.T., 1/15/25, at 38-41. She testified as follows:

Q: Has [D.W.] ever struck [the C]hildren?

A: Just that once that I'm aware of.

Q: [W]ere any implements utilized by [D.W.]?

A: Not that I remember.

Q: Not that you remember? Were you present for that?

A: Not while that was happening. . . .

*Id.* at 39. She further testified that she was not aware of the details of the abuse because the Children "didn't tell me they were hurt" and D.W. was the sole abuser. N.T., 3/27/25, at 45. The court did not find Mother credible in this regard. Instead, the orphans' court found the testimony of A.W., D.W.'s daughter, to be credible.

A.W. testified that in July 2022, punishments against the Children were becoming more violent. *See* N.T., 1/15/25, at 106-107. She stated that D.W. "started hitting [the Children] harder, yelling at them more, screaming at them, [and] throwing things at them. . . ." *Id.* at 107. A.W. testified that D.W. utilized the paddle against the Children "too [many times] to keep track of," and that Mother was "typically in the same room" for punishments inflicted by D.W. *Id.* at 112, 117. A.W. also testified that Mother used the paddle on the Children on "ten or more" occasions. *Id.* at 117.

Despite the abuse, Mother continued her relationship with D.W. throughout the Children's dependencies. As found by the orphans' court, Mother could not definitively state that the Children would not be abused again if they were returned to her and D.W.'s care. *See* N.T., 1/30/25, at 175-177; *see also* DHS Exhibit 38. Ms. Harer, reunification services provider, testified

that she spoke with Mother and D.W. in November 2024 about what they needed to do to reunify with the Children. *See id.* On direct examination, she described the encounter, as follows:

> I [tried] to redirect [and focus] on their goals . . . but [] I couldn't redirect it, so finally, I answered and said: It is my understanding and it is my belief, that in order for the [Children] to come to you and live with you and be in your home, there would have to be a full, complete faith and understanding and belief that what happened in those video recordings would never, ever happen again. That's what [DHS] would need to see for them to even feel safe entertaining the [C]hildren being returned to your home.
>
> At that point, [D.W.] sat . . . back in his chair and looked at me kind of, almost seemed like he might be shocked, and said: That's not a realistic expectation. That's like saying that I can drive a car down the road tomorrow or every day for the rest of my life and I'll never wreck. I'll never get into a car accident. That's just not realistic. And I wanted to clarify, so I said: You're saying it's not a realistic expectation that the [C]hildren would never be harmed again? And he said: It's just an unrealistic expectation to think that they could be returned home and this would never happen again. . . .
>
> [Mother] was sitting at the table with us. [Mother] was agreeing with [D.W.], shaking her head that she thought it was unrealistic as well.

N.T., 1/30/25, at 176-177. In that same conversation, Ms. Harer testified that she asked Mother what she would do if D.W. became violent again and Mother indicated that she did not know. *See id.* at 177.

While Mother correctly notes that the Children were no longer subjected to abuse following their removal in February 2023, the orphans' court found that Mother and D.W. "could not continue to physically abuse the [C]hildren as they were no longer in reach." Orphans' Court Opinion, 7/31/25, at 17.

Further, Mother's completion of various services did nothing to assuage the concerns presented by DHS, namely, Mother's inability to protect and appropriately discipline the Children and her refusal to take responsibility for the abuse the Children endured.

To the extent that Mother argues that her ability to appropriately care for and safeguard the Children was not adequately measured or tested, DHS presented the above-described evidence, which sufficiently establishes that Mother was incapable of appropriately parenting and protecting the Children. Moreover, Mother does not cite to any law, and we are aware of none, that requires a formal test to ascertain parental ability.

Finally, while the record supports Mother's contention that her supervised visits improved when she visited with the Children individually, the record demonstrates that she was unable to protect and appropriately discipline the Children collectively. Importantly, at the time of the subject proceedings, Mother was not visiting with the Children jointly. **See** N.T., 1/17/25, at 144; **see also** N.T., 1/29/25, at 4-5, 17, 27-28, 95, 166, 184; **see also** N.T., 1/31/25, at 7.

Based on the foregoing, we conclude that the record clearly establishes that Mother's repeated and continued incapacity, abuse, and refusal to protect and appropriately discipline the Children has caused the Children to be without essential parental care, control, or subsistence necessary for their physical and mental well-being since their removal in February 2023. Finally, the

record supports that Mother's incapacity, abuse, and refusal cannot or will not be remedied inasmuch as these concerns persisted after two years of services. Therefore, we discern no abuse of discretion in the orphans' court's determination that involuntary termination of Mother's parental rights was warranted pursuant to Section 2511(a)(2).

Since the record supports the orphans' court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to a review of the court's findings pursuant to Section 2511(b). Mother contends that the orphans' court abused its discretion because it failed to adequately consider her bond with the Children. *See* Mother's Brief at 21. Specifically, Mother assails the court for failing to order a bonding assessment. *See id.* at 23. Mother further argues that she had an "extensive" bond with the Children as evidenced by their desire to return to her care. *Id.* She asserts that involuntarily terminating her parental rights would cause the Children "complete devastation." *Id.* at 24 (citing N.T., 1/31/25, at 163, 165). She emphasizes that the court recognized this bond in its opinion when it stated that the Children will require support and therapy to address the termination of Mother's parental rights. *See* Mother's Brief at 24 (citing Opinion, 5/27/25, at 11).

In its Rule 1925(a) opinion, the orphans' court found as follows regarding Section 2511(b):

The testimony and evidence presented indicated that while the Children have a bond with Mother, that same bond creates

significant difficulties for each child. It interferes with their ability to process the trauma and abuse they had experienced and has resulted in them acting out to such a degree they were removed from placement after placement. Moreover, the Children disengage or shut down when the subject of Mother is brought up by counselors and agency staff. The Children, most notably, D.L.J, would have more disruptive behaviors following visits with Mother. N.T., 1/29/25, at 111, 127. Two of the Children, A.M.J. and D.L.J., expressed a desire to return home with Mother.

The Children experienced significant trauma, and expert testimony noted the import of addressing that trauma as closely in time to its inception as possible. *See* N.T., 1/30/25, at 22. The Children resisted working on that trauma due to their uncertainty about when or if they were returning to the home of Mother and [D.W.] As reunification with Mother was not foreseeable, the uncertainty of their future only served to compound their behaviors and retraumatize them. *See, e.g.*, N.T. 1/30/25, at 19-21.

Mother also consistently denied the abuse when the Children would make disclosures. **The undersigned finds that . . . the bond with Mother was restricting the Children and holding them back from processing their trauma and establishing permanency.**

The trial court does not blithely discard the emotional bond between Mother and the Children, but finds that termination best serves the Children's needs and welfare. The record demonstrates that the Children's bond with Mother has had a negative impact on their emotional needs and welfare.

Orphans' Court Opinion, 7/31/25, at 21-22 (emphasis added). The orphans' court's findings are supported by the certified record.

Despite Mother's assertion to the contrary, the court sufficiently considered the bond between Mother and the Children and determined that it was not beneficial. In support thereof, the court cited testimony by Dr. Phillips, supervisor of the Children's treatment and therapist of D.L.J. at

Crossroads Counseling. Significantly, Ms. Phillips opined that the Children require "consistency and structure . . . predictability and safety." N.T., 1/30/25, at 27. She posited that it is imperative that perpetrators of abuse "take responsibility for what [they have] done. . . . [I]f someone is denying that something happened and not taking responsibility for it, it's hard to move forward in that process[.]" *Id.* at 24. On cross-examination by the GAL, Ms. Phillips further explained:

> Q: [Y]ou had testified that if a parent is denying and not taking responsibility, especially directly to the child, that's going to be another factor that doesn't create stability and consistency and actually set[s] them back?
>
> A: Yep, it creates [an unsafe] environment for them. . . .
>
> Q: At the same time, a child can love a parent who was an abuser who neglected to stop abuse?
>
> A: Yes. They can.
>
> Q: But if a parent is not accepting responsibility and not working toward fixing the issue, that becomes retraumatizing?
>
> A: It does.
>
> Q: And . . . is it a continued break in the trust . . . or it just never repairs the trust?
>
> A: It can . . . do one or the other based on the circumstances of the situation, so it can continue to hinder repairing, which is most of the time. It can hinder repairing because the child . . . is in a state of confusion[.] [T]hey don't know if . . . they can trust that it's safe . . . and if a child feels like they can't predict that, they're going to . . . not move forward and progress in their trauma treatment.

*Id.* at 82-83.

- 21 -

Ms. Phillips testified that "the closer that we can [treat] kids to the age of where the trauma occurs, the easier time that child has in undoing trauma. . . ." *Id.* at 22. As discussed *supra*, Mother repeatedly denied that the Children were abused, including to the Children directly. The court's acknowledgment that the Children will require support and therapy due to the termination of Mother's parental rights indicates the court's understanding that the Children share a bond with Mother. *See* Mother's Brief at 24 (citing Opinion, 5/27/25, at 11). The court's acknowledgment does not constitute a finding that the bond shared between Mother and the Children is necessary and beneficial. On the contrary, as aptly stated in its Rule 1925(a) opinion, the court determined that the bond was negatively impacting the Children. *See* Orphans' Court Opinion, 7/31/25, at 21-22.

Finally, as discussed above, the Children have each been in separate and numerous foster placements throughout the underlying matter. With respect to A.M.J., the oldest child, according to Ms. Seleski, at the time of the subject proceedings, he was "doing really well" with his foster mother and continuing to receive mental health counseling. N.T., 1/17/25, at 112-113; *see also* N.T., 1/30/25, at 2-4, 97. In contrast, Ms. Seleski testified that S.D.J. was receiving inpatient behavioral and mental health treatment at the time of the proceedings, which had continued for approximately one year. *See* N.T., 1/17/25, at 114-115. Finally, D.L.J. has received a myriad of therapeutic treatments during the underlying matter and was admitted to the

hospital in December 2024, shortly before the subject proceedings commenced. *See* N.T., 1/15/25, at 52; N.T, 1/29/25, at 122-123, 195. As best we can discern, D.L.J. was no longer hospitalized at the conclusion of the termination hearing.

Based upon the foregoing, the orphans' court's conclusion that the Children's developmental, physical and emotional needs and welfare were best served by the termination of Mother's parental rights is fully supported by the certified record. Therefore, we discern no abuse of discretion pursuant to Section 2511(b). Accordingly, we affirm the decrees.

Decrees affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/12/2026